LEVI & KORSINSKY LLP
Eduard Korsinsky (to be admitted *pro hac vice*)
Juan E. Monteverde (Trial Attorney, pending admittance *pro hac vice*)
Jerald M. Stein (to be admitted *pro hac vice*)
39 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Lynn D. Pundzak (0034684)
Local Counsel

Attorneys for Plaintiff, Individually and On Behalf of
All Others Similarly Situated



## IN THE COURT OF COMMON PLEAS

## HAMILTON COUNTY, OHIO

| | |
|---|---|
| JOHN LEVIN, individually and on behalf of all others similarly situated , | Case No. A 0 8 0 7 6 8 1 |
| Plaintiff, | **CLASS ACTION** |
| vs. | **COMPLAINT FOR VIOLATION OF SECURITIES LAW** |
| FIFTH THIRD BANCORP (Fifth Third Center, Cincinnati, Ohio 45263), KEVIN T. KABAT, CHRISTOPHER G. MARSHALL, DARRYL ALLEN, ALLEN HILL, MITCHEL LIVINGSTON, JAMES ROGERS, ROBERT L. KOCH, II, THOMAS TRAYLOR, JOHN BARRETT, JOHN SCHIFF, DUDLEY TAFT, HENDRIK MEIJER, GARY HEMINGER, ULYSSES S. BRIDGEMAN, JR., JAMES P. HACKETT, and GEORGE A. SCHAEFER, JR., | **JURY DEMAND** |
| Defendants. | |

## Please Serve Defendant Fifth Third Bancorp's Agent, Paul L. Reynolds,

## By Certified Mail, at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.

Plaintiff, by and through his attorneys, upon information and belief, except as to the

allegations pertaining specifically to plaintiff which are based on personal knowledge, makes the

following allegations. Plaintiff's counsel's investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Fifth Third Bancorp ("Fifth Third" or "Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, and media reports about the Company.[1] Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein which will be incorporated after a reasonable opportunity for discovery.

1. This is a class action on behalf of all First Charter Corporation ("First Charter") shareholders who purchased shares of Fifth Third common stock pursuant to the Form S-4 Registration Statement and Prospectus (the "Prospectus") filed by Fifth Third with the SEC originally on November 7, 2007 and then amended on November 29, 2007 (SEC File No. 333-147192) the ("Class") in connection with the merger between Fifth Third and First Charter.

2. On August 16, 2007, Fifth Third announced that it signed a merger agreement with First Charter whereby Fifth Third would pay $31.00 per First Charter share. As specified in the merger agreement, consideration would be paid as follows: 70% Fifth Third common stock and 30% cash.

3. In connection with the merger, on November 29, 2007, Fifth Third filed the Prospectus with the SEC to gain support for the merger from First Charter shareholders.

4. On June 6, 2008, Fifth Third announced the completion of its acquisition of First Charter. First Charter common stock shareholders received 1.7412 shares of Fifth Third common stock for each share of First Charter common stock.[2]

---

[1] Pursuant to Civil Rule 10, the SEC filings upon which the complaint are predicated were not attached hereto as they are extremely lengthy. Plaintiffs counsel will provide the court with a copy upon request; otherwise, they are available online at http://sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0000035527&owner=include&count=40.

[2] According to a press release announced by Fifth Third on June 6, 2008:

Preliminary results of the First Charter shareholder election process indicate that cash option was selected in exchange for approximately 26-31 percent

5.      The Class is pursuing remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k and 77l. The Securities Act imposes liability on a company's directors and officers, among others, for failure to issue a registration statement and prospectus that fully and accurately informs investors of all material facts, including but not limited to material facts concerning industry trends affecting the issuer company. The issuer itself is held strictly liable for any material misstatements or omissions found in its prospectus.

6.      This Complaint alleges that the Class were sold shares of Fifth Third common stock pursuant to a false and materially misleading Prospectus. The statements made in the Prospectus contained material omissions because, at the time of the filing, as well as through the time the merger was completed, Fifth Third was already suffering from several adverse factors that were not revealed and/or adequately disclosed in the document. These factors include, but are not limited to, failure to disclose the Company's exposure to the growing credit crisis, the increase in its non-performing loans and deterioration in its Tier I[3] assets, as well as negligently failing to fully detail

---

of First Charter shares. Those shareholders who made a valid cash election will either receive consideration in accordance with their election or will receive a portion of their consideration in Fifth Third common stock and the remainder in cash, depending upon the final results of the election which will be published within approximately seven days.

Approximately 57 percent of First Charter shares elected to receive Fifth Third stock and consequently, Fifth Third anticipates that those First Charter shareholders that made a valid election to receive shares of Fifth Third common stock will receive consideration in accordance with their election. Shareholders who did not make a valid election or who expressed no preference will either receive shares of Fifth Third common stock for their shares of First Charter common stock or will receive a portion of their consideration in cash and the remainder in Fifth Third common stock, depending upon the final results of the election.

First Charter common stock shareholders who receive shares of Fifth Third common stock in the merger will receive 1.7412 shares of Fifth Third common stock for each share of First Charter common stock and cash in lieu of fractional shares of Fifth Third common stock. The amount of cash in lieu of a fractional share of Fifth Third common stock will be determined by multiplying the fraction otherwise due by $31.00.

[3]      Tier I capital is a term used to describe the capital adequacy of a bank. Tier I capital is core capital, which includes equity capital and disclosed reserves.

negative downward trends observed by the Company, that were not temporary, but were to be long-lived.

7.     Defendant Kevin T. Kabat, the Company's president and chief executive officer, and Christopher G. Marshall, the Company's executive vice president and chief financial officer at the time the Prospectus was filed, could have – and should have – discovered the material misstatements and omissions in the Company's Prospectus prior to its filing with the SEC and distribution to the First Charter shareholders, but failed to do so.

**JURISDICTION**

8.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77l. Federal and state courts have concurrent jurisdiction of claims under Section 22 of the 1933 Act, 15 U.S.C. §77(a).

9.     The violations of law complained of herein occurred in part in this County, including the dissemination of materially false and misleading statements complained of herein into this County, and defendants and their affiliated corporations and partnerships have operations located in this County.

**PARTIES**

10.     Plaintiff John Levin, is, and at all times relevant herein was, a resident of Connecticut. The plaintiff, was a shareholder of First Charter at the time of the merger between First Charter and Fifth Third, and was caused to acquire Fifth Third shares pursuant to the merger and has been damaged thereby.

11.     Defendant Fifth Third Bancorp is an Ohio corporation with its principal executive offices located at Fifth Third Center, Cincinnati, Ohio 45263. Fifth Third operates as a diversified financial services holding company. The Company's Commercial Banking segment offers banking,

4

cash management, and financial services; traditional lending and depository products and services; and other services, including foreign exchange and international trade finance, derivatives and capital markets services, asset-based lending, real estate finance, public finance, commercial leasing, and syndicated finance for business, government, and professional customers. Its Branch Banking segment provides a range of deposit, loan, and lease products to individuals and corporations. Its products include checking and savings accounts, home equity loans and lines of credit, and credit cards and loans for automobile and personal financing needs. The Company's Consumer Lending segment is involved in mortgage and home equity lending activities, such as origination, retention, and servicing of mortgage and home equity loans; other indirect lending activities (which include loans to consumers through mortgage brokers, automobile dealers, and federal and private student education loans). Its Investment Advisors segment offers a range of investment alternatives for individuals, companies, and not-for-profit organizations. This segment also offers investment, trust, asset management, retirement planning, and custody services, as well as retail brokerage services to individual clients and broker dealer services to the institutional marketplace. The Fifth Third Processing Solutions segment offers electronic funds transfer, debit, credit, and merchant transaction processing services; and data processing services.

12.     Defendant Kevin T. Kabat ("Kabat"), at all relevant times, was the Chief Executive Officer ("CEO") and/or President of Fifth Third. Kabat signed the Prospectus.

13.     Defendant Christopher G. Marshall ("Marshall") signed the Prospectus as Executive Vice President and Chief Financial Officer of the Company.

14.     Defendant Darryl Allen ("Allen") has been a Director of the Company since 1997. Allen signed the Prospectus.

15.     Defendant Allen Hill ("Hill") has been a Director of the Company since 1998. Hill signed the Prospectus.

16.     Defendant Mitchell Livingston ("Livingston") has been a Director of the Company since 1997. Livingston signed the Prospectus.

17.     Defendant James Rogers ("Rogers") has been a Director of the Company since 1995. Rogers signed the Prospectus.

18.     Defendant Robert L. Koch, II ("Koch") has been a Director of the Company since 1999. Koch signed the Prospectus.

19.     Defendant Thomas Traylor ("Traylor") has been a Director of the Company since 1999. Traylor signed the Prospectus.

20.     Defendant John Barrett ("Barrett") has been a Director of the Company since 1988. Barrett signed the Prospectus

21.     Defendant John Schiff ("Schiff") has been a Director of the Company since 1983. Schiff signed the Prospectus.

22.     Defendant Dudley Taft ("Taft") has been a Director of the Company since 1981. Taft signed the Prospectus.

23.     Defendant Hendrik Meijer ("Meijer") has been a Director of the Company since 2001. Meijer signed the Prospectus.

24.     Defendant Gary Heminger ("Heminger") has been a Director of the Company since 2006. Heminger signed the Prospectus.

25.     Defendant Ulysses S. Bridgeman, Jr. ("Bridgeman") has been a Director of the Company since 2007. Bridgman signed the Prospectus.

26.     Defendant James P. Hackett ("Hackett") has been a Director of the Company since 2001. Hackett signed the Prospectus.

27.     Defendant George A. Schaefer, Jr. ("Schaefer") signed the Prospectus as a Director of the Company. Schaefer was a Director of the Company from 1988 to 2008.

28.     Defendants Kabat, Marshall, Allen, Hill, Livingston, Rogers, Koch, Traylor, Barrett, Schiff, Taft, Meijer Heminger, Bridgeman, Hackett, and Schaefer are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons or entities who acquired the shares of Fifth Third in connection with the merger agreement between Fifth Third and First Charter pursuant and/or traceable to the false and misleading Prospectus, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Pursuant to a registration statement filed by Fifth Third with the SEC on June 6, 2008, 35,920,000 shares of First Charter are expected to be exchanged in connection with the merger.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class purchased shares in the same company and are similarly affected, even if to different degrees, by defendants' wrongful conduct.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class, has no conflicts and has retained counsel competent and experienced in class and securities litigation.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Prospectus issued by defendants to the First Charter shareholders omitted and/or misrepresented material facts about the Company and its business prospects; to what extent the members of the Class have sustained damages thereby; and the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small compared to the Class as a whole, the expense and burden of individual litigation would significantly detract from the ability of Class members individually to redress the wrongs done to them. Additionally, individual litigation would be inefficient for the legal system and lead to the possibility of inconsistent rulings. There will be no difficulty in the management of this action as a class action.

## GENERAL DESCRIPTION OF THE MERGER

35. On August 16, 2006, Fifth Third announced that it had signed a merger agreement with First Charter, under which Fifth Third would acquire First Charter for $31.00 per First Charter share, or $1.09 billion. Consideration would be paid in the form of 70% Fifth Third common stock and 30% cash.

36. The press release announcing the merger stated that Fifth Third would file a Form S-4 Registration Statement and other relevant documents regarding the Merger with the SEC.

37. On November 7, 2007, Fifth Third filed a Form S-4 Registration Statement and a Prospectus with the SEC. Fifth Third filed an Amended Form S-4 Registration Statement on November 27, 2007 with the SEC (collectively, the "Prospectus").

38.     Further, the Prospectus incorporated by reference various documents already filed with the SEC, as well as a wide range of documents that would be filed with the SEC in the future until the securities offered in this prospectus would be exchanged.

39.     According to the Prospectus, the Prospectus would be mailed to shareholders on December 3, 2007.

40.     On June 6, 2008, Fifth Third announced the completion of its acquisition of First Charter. First Charter common stock shareholders will receive 1.7412 shares of Fifth Third common stock for each share of First Charter common stock.

## SUBSTANTIVE ALLEGATIONS

41.     Certain of the adverse factors affecting Fifth Third's business were first revealed on June 18, 2008, before the market opened. At that time, the Company issued a press release stating that it was forced to cut its quarterly dividend by 66.0%, to 15 cents from 44 cents a share, and had to sell non-core businesses for at least $1.0 billion in extra capital. The Company also stated it planned to raise $1.0 billion through an offering of convertible preferred shares, which would prove dilutive to common shareholders.

42.     The Company further stated that earnings would be reduced by a provision expense expected to be between $350.0 million and $375.0 million greater than net charge-offs for the second quarter. "Our bottom line results won't meet our expectations. We are not satisfied with these results and know that they are as disappointing to investors as well," the Company said.

43.     The Company also revised its capital targets to an 8.0% to 9.0% range for its Tier 1 capital ratio and projected a second-quarter Tier 1 capital ratio of 8.5%, which includes the impact of its First Charter acquisition and related accounting adjustments. The projection did not, however, include a possible reduction of 20 basis points from charges on earnings related to leveraged leases in the second quarter.

44.     The Company now expects 2008's ratio of reserves to loans and leases to exceed 2.0% and anticipates an even higher ratio in 2009.

45.     "We currently expect 2009 net charge-offs to be higher than 2008 levels and provision expense to continue to exceed charge-offs, resulting in continued growth in our loan loss reserves," the Company said.

46.     These disclosures caused the Company's common stock to decline 27%, to close on June 18, 2008 at $9.26 per share on very heavy volume. The Company's stock had traded as high as $28 per share in February, 2008.

47.     On October 19, 2007, the Company issued a press release and its quarterly financial statement announcing its earnings for the third quarter of 2007. The Company reported third quarter 2007 earnings of $376 million, or $0.71 per diluted share, compared with $376 million, or $0.69 per diluted share, in the second quarter of 2007 and $377 million, or $0.68 per diluted share, for the same period in 2006.

48.     Defendant Kabat stated that "[t]hird quarter results were solid in a quarter that saw significant market disruption. While we weren't completely immune from that disruption, we were spared most of its effects." He also reported that "[r]evenue growth of two percent sequentially and seven percent from a year ago was impressive, given the market, with strength in both net interest income and fee income."

49.     He stated that "[e]xpenses were also well controlled during the quarter. Credit continues to be a challenge and we are actively managing our risks as the cycle progresses. We continue to expect further deterioration in credit trends for the near future but the deterioration to remain manageable. Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans."

50.     The statements contained in the press release were materially false and misleading.

Mr. Kabat failed to disclose that the Company's operating expenses were actually increasing at a dangerously swift pace and the Company was suffering under the weight of higher loan loss provisions stemming from deterioration in credit quality.

51.     The Company was also experiencing greater net charge-offs and had failed to sufficiently raise loan loss provisions to an adequate level.

52.     On January 22, 2008, the Company issued its fourth quarter and year-end earnings for 2007. The press release detailed the results as follows:

> 2007 earnings of $1.1 billion, or $2.03 per diluted share, compared with $1.2 billion, or $2.13 per diluted share in 2006. Reported fourth quarter 2007 earnings were $38 million, or $0.07 per diluted share, compared with $325 million, or $0.61 per diluted share in the third quarter of 2007 and $66 million, or $0.12 per diluted share, for the same period in 2006. Reported results included a non-cash estimated charge of $155 million, both pre-tax and after-tax, or $0.29 per share, to lower the current cash surrender value of one of our Bank-Owned Life Insurance ("BOLI") policies. Additionally, quarterly results included a non- cash charge of $94 million pre-tax, or $0.12 per share after-tax, related to Visa members' indemnification of estimated future litigation settlements, as well as $8 million pre-tax, or $0.01 per share after-tax, in acquisition- related costs primarily associated with the acquisition of R-G Crown, which closed in early November.

53.     Defendant Kabat commented on the results and, though stating that the credit markets were under stress, the Company was performing well overall:

> Obviously, this has been a difficult quarter for the banking industry. Like others, we saw a fairly marked turn in credit performance during the quarter. And, while we have not had any significant market-related losses on structured securities, loans, or funds we manage for others, one of our BOLI insurance policies was invested in assets that experienced significant market declines due to widening credit spreads, which negatively impacted our reported results. Operating results continue to be relatively strong, in terms of loan and core deposit growth, net interest income growth, and noninterest income growth. However, the credit environment remains challenging, and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term. This led to an increase in our loan loss reserves in the fourth quarter and, given current trends, we would expect that to continue in the near-term. We have been actively working over the past year to take steps to address areas of concern. These areas include home equity loans and,

more generally, real estate loans, particularly in the upper Midwest and Florida.

As a lending institution, we know we will experience credit cycles and we expect them. It is our responsibility to ensure that we are prepared for them and that we have the balance sheet strength and earnings power to manage through them. Fortunately, Fifth Third is well-positioned on both counts, and we intend to continue to focus on executing on our strategic plans and capitalizing on opportunities presented by this environment.

54.     According to the Prospectus, the statements detailed above are incorporated by reference into the Prospectus.  (See Prospectus, filed by Fifth Third with SEC on November 29, 2007, pg 141-142).

55.     The statements detailed above were false and misleading for several reasons. The Company and Mr. Kabat failed to disclose that Non-Performing Assets (those no longer paying interest) were increasing at a dangerous rate. And while Mr. Kabat stated the loan portfolio was under pressure, it was actually in need of a major capital infusion. Moreover, the Company failed to disclose increasing negative trends in loan-loss provisions. Further, there was a steady acceleration in non-performing assets that defendants knew would continue into the immediate future.

56.     On April 22, 2008, the Company issued first quarter 2008 earnings of $292 million, or $0.55 per diluted share, compared with $16 million, or $0.03 per diluted share in the fourth quarter of 2007 and $359 million, or $0.65 per diluted share, for the same period in 2007.

57.     Commenting on the results, Defendant Kabat stated as follows:

This quarter we produced excellent loan and deposit growth that drove impressive performance in net interest income and continued strong fee growth from our businesses," said Kevin T. Kabat, President and CEO of Fifth Third Bancorp. "However, strong operating performance continues to be offset by higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans. Nonperforming asset growth and higher loan losses reflect a weaker economic environment and continue to be disproportionately experienced in Florida and Michigan. Based on these developments, we significantly increased our allowance for loan and lease losses during the quarter.

We remain very active in taking steps to address the issues we and the industry are facing, and to work with borrowers to address difficulties they are experiencing. We expect credit conditions to continue to deteriorate in the near term, and to experience higher nonperforming assets and credit losses during this period.

Although every credit cycle differs, we expect them to occur. We take seriously our responsibility to provide credit to our customers, to lend prudently, and to maintain the capital necessary to manage through these cycles. This is an unusually difficult cycle, but we believe Fifth Third is well-positioned relative to many of its peers. We expect to continue to post strong operating results, to execute on our strategic plans, and to capitalize on the opportunities that are created by an environment such as this.

58.     According to the Prospectus, the statements detailed above are incorporated by reference into the Prospectus. (See Prospectus, filed by Fifth Third with SEC on November 29, 2007, pg 141-142).

59.     The Company's statements and Mr. Kabat's comments were false and misleading for the following reasons:

a)  While the results were better than analysts expected – sending the stock up eight percent – they failed to disclose that the ever-increasing provisions for loan and lease losses were placing the Company's capital structure in jeopardy, necessitating a major cash infusion.

b)  The Company's Tier 1 capital ratio was in need of support because it had continued to deteriorate. The deterioration necessitated a major infusion of capital since at least the beginning of the Class Period.

c)  Credit losses were mounting in an unabated trend as the housing market continued to stumble in the Mid-West region and net charge-offs were projected to continue to climb well into 2009. Indeed, net charge-offs would amount to a substantial percentage of total loans and leases.

d)  The Company's deteriorating capital base necessitated a sale of non-core businesses to

supplement common equity capital.

e) The Prospectus, itself, negligently omitted material information concerning: (i) the Company's exposure to certain poorly performing real estate markets, including Florida, Ohio, and Michigan, and the extent to which this exposure was materially increasing; (ii) the Company's growing exposure to late payments and defaults on mortgages and other non-performing loans, and the extent to which this exposure was materially increasing; (iii) the extent of the decline in the quality of the Company's Tier 1 capital base; (iv) the deteriorating credit trends and increasing expenses, including negative trends, in the Company's consumer loan portfolio, including the extent of the increase in late payments and defaults; (v) the negative trends in the Company's home equity and commercial construction loans, and the extent to which there was a decrease in the value of the underlying assets and an increase in late payments and defaults, and (vi) the deterioration in the credit quality of its loans.

60. As a result of Defendants' false statements and material omissions in the Prospectus and the documents and press releases incorporated by reference into the Prospectus, the Company's securities traded at artificially inflated prices from the time the Merger was announced up until through the closing of the merger on June 6, 2008.

## THE TRUTH EMERGES

61. On June 18, 2008, the Company stated it would slash its quarterly dividend and earnings would be as little as 1 cent to 5 cents a share for the second quarter. Analysts had predicted earnings of more than 40 cents per share.

62. Additionally, in a desperate move to shore up capital, the Company said it would sell subsidiaries and issue preferred stock to raise $2 billion. The Company also announced the cost of uncollectible loans in 2009 will rise well above 2008 levels – thereby substantiating the ever

increasing (though undisclosed) negative trends pressuring the Company. Mr. Kabat also stated he would assume the role of Chairman of the Board.

63.　Moreover, these disclosures demonstrated that the Company's Tier 1 capital was under pressure, requiring immediate support.

64.　Fitch Ratings downgraded the Company one level due to deteriorating trends in asset quality.

65.　These sudden revelations, which were in sharp contrast to the Defendants' misstatements and omissions in the Prospectus (and the documents incorporated by reference into the Prospectus) detailed above, caused the Company common stock to decline 27% to close at $9.26 per share on very heavy volume. The Company's stock had traded as high as $28 per share in February, 2008.

## CAUSES OF ACTION

### COUNT I
### For Violation of Section 11 of the Securities Act
### (Against All Defendants)

66.　Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

67.　This claim is brought by Plaintiff on his own behalf and on behalf of other members of the Class who acquired Fifth Third shares pursuant to the Merger.

68.　Defendant Fifth Third is the issuer of the shares sold pursuant to the Prospectus.

69.　The Company, as issuer of the securities sold through the Prospectus, is strictly liable to plaintiff and the Class for the material misstatements and omissions alleged herein.

70.　The Individual Defendants participated in the preparation, issuance and dissemination of; issued and disseminated, and caused to be issued and disseminated, to the investing public the materially false and misleading Prospectus.

71. Each of the Individual Defendants signed the Prospectus.

72. The Individual Defendants owed to plaintiff and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and correct and that there was no omission of material fact required to be stated to make the statements contained therein fair and accurate.

73. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

74. Plaintiff alleges that he and the other members of the Class purchased their Fifth Third shares in direct and proximate reliance on, and without knowledge of the falsity of the Prospectus.

75. As a direct and proximate result of each Defendant's unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered substantial damages in connection with their purchases of First Third securities pursuant to the Merger and Prospectus.

76. At the time plaintiff and the Class obtained their shares of First Third in connection with the merger, plaintiff and the Class had no knowledge of the facts concerning the misstatements or omissions alleged herein.

77. This action is brought within one year after discovery of the material misstatements and material omissions in the Prospectus, and within three years of the effective date of the Prospectus, which was November 27, 2007.

78. By reason of the conduct alleged herein, each defendant violated Section 11 of the Securities Act.

79. By virtue of the foregoing, Plaintiff and the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them,

jointly and severally, in an amount to be proven at trial.

## COUNT II
### For Violation of Section 15 of the Securities Act
### (Against Individual Defendants Kabat and Marshall)

80.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

81.     The Individual Defendants Kabat and Marshall, by reason of their management positions, are controlling persons of the Company within the meaning of Section 15 of the Securities Act and are liable for the Company's violation of Section 11 of the Securities Act as set forth herein.

82.     Mr. Kabat was the Company's CEO and President. He thus was capable of causing and did in fact cause the Company to sell the shares pursuant to the Prospectus.

83.     As set forth herein, Marshall was the Company's Executive Vice President and Chief Financial Officer. He thus was capable of causing and did in fact cause the Company to sell the shares pursuant to the Prospectus.

84.     By virtue of their high-level positions of control, Defendants Kabat and Marshall had the power to influence and control and did influence and control the decision-making of the Company.

85.     By virtue of their position as a controlling person, the Individual Defendants Kabat and Marshall are liable, pursuant to Section 15 of the Securities Act, for the Company's material misstatements and material omissions in the Prospectus, and its violations of Section 11 of the Securities Act.

86.     The Individual Defendants Kabat and Marshall also were culpable participants in the violations of Section 11 of the Securities Act alleged above, based on their direct participation in the process which allowed the sale of shares in the Prospectus to be successfully completed. As a

result of the foregoing, Plaintiff and the other members of the Class suffered damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment, as follows:

1. Determining that this action is a proper class action, certifying the Class, certifying plaintiff as Class representative, and certify counsel as Class counsel;

2. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

4. Awarding rescission or a rescisionary measure of damages; and

5. Awarding such additional equitable/injunctive or other relief as the Court deems just and proper.

Dated: August 13, 2008
Respectfully submitted,


Lynn D. Pundzak (0034684)
Of Counsel
Suite 999, 2nd National Building
830 Main Street
Cincinnati OH, 45202
(513) 564-9999
fax: (513) 345-4703
E-mail: ldplaw@fuse.net

**LEVI & KORSINSKY LLP**
Eduard Korsinsky
Juan E. Monteverde (Trial Attorney for Plaintiff)
Jerald M. Stein
39 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
E-mail: JMonteverde@zlk.com

*Attorneys for Plaintiff and the Class*

Plaintiff demands a trial by jury.

Lynn D. Pundzak (0034684)
Of Counsel